**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION**


**FEDERAL INSURANCE COMPANY, as
subrogee of Forrest County General Hospital**                                    **PLAINTIFF**

**VERSUS**                                    **CIVIL ACTION NO. 2:08cv156KS-MTP**

**GENERAL ELECTRIC COMPANY**                                    **DEFENDANT**

## MEMORANDUM OPINION

This cause is before the Court on the motion for summary judgment [Doc. #37] and

memorandum in support [Doc. # 38] filed by Defendant General Electric Company ("GE").  The

motion is opposed by Plaintiff Federal Insurance Company ("FIC").  Pl.'s Resp. Mot. Summ. J.

[Doc. # 51].  The court, having reviewed the motion, the responses, the pleadings and exhibits on

file and being otherwise fully advised in the premises, finds that the summary judgment motion

should be **granted in part and denied in part**.  The court specifically finds as follows:


## I. FACTS

General Electric Capital Corporation ("GE Capital") leased a .07 Tesla OpenSpeed MRI

machine to Forrest General Hospital, Plaintiff's subrogee, in October 2002.  In addition to the

lease terms in the Master Lease Agreement and Equipment Addendum, the agreement contained

a Maxiservice Schedule along with several support exhibits providing for the MRI's

maintenance.  Maintenance under this schedule was to be provided by General Electric Medical

1

Systems ("GEMS"), a division of General Electric Company.[1]  The terms and conditions in the

Master Lease Agreement were incorporated by reference into the service agreement.

The installation and operation of an MRI machine requires building and site

specifications.  GE Capital in its lease specifies that the "Lessee shall be responsible for making

the site ready for installation in compliance with Lessor's written specifications."  Pl.'s Resp.

Mot. Summ. J., Ex. 17 [Doc. # 51-19].  GE provides an Installation Manual that provides the

specifications and requirements.[2]  In this case, however, GEMS entered into a Renovation

Contract with the hospital. Pl.'s Resp. Mot. Summ. J., Ex. 16 [Doc. # 51-18].  The Work Scope

of this contract included the addition of ventilation systems.  [Doc. #40-2 at 45].  Caffey, Inc.

was contracted to design and build the improvements, and the parties dispute whether GEMS

maintained significant control over the system's design or delegated that responsibility to

Caffey.

One of the necessary improvements described by the Installation Manual is a cryogenic

vent system.  This vent and continuous power for cooling are required for the safe operation of

an MRI machine.  The MRI contains a superconducting magnet that must be maintained at a

very low temperature (4.2 degrees Kelvin or minus 452 degrees Fahrenheit) to effectively

operate.  Compl. ¶ 14.  To maintain this temperature the magnet is surrounded by liquid helium.

If the machine loses power for more than 48 hours, the liquid helium gasifies causing the

---

[1]The only Defendant named in the suit is General Electric Company, and not General
Electric Capital Corporation.  For clarity, however, this Court will refer to the particular division
of GE, GEMS, where applicable to distinguish it from the Lessor, GE Capital.

[2]The Technical Publication, Signa Open*Speed* Pre-Installation [Doc. #40-10] is labeled
"GE Medical Systems" and is copyrighted by General Electric Company, Inc.

pressure to increase. The cryogenic vent system is installed to relieve the pressure by allowing the helium gas to vent to the outside of the building. This process is called a "quench." Quenches can damage the magnet and refilling the helium vessel to restore superconductivity is costly and time consuming. For that reason, GEMS warns in its Installation Manual that the hospital should provide cooling 24 hours a day, 7 days a week. Def.'s Br. Supp. Mot. Summ. J. at 3, 10 [Doc. #38]. The Installation Manual also warns that the customer is responsible for the cost of restoring the magnet's superconductivity in the case of a magnet quench due to a power loss of 48 hours or more. Def.'s Br. Supp. Mot. Summ. J., Ex. I, sub-Ex. 1 at 63 [Doc. #40-10]. In the service schedule to the master lease, GEMS states that the agreement excludes "any service, components, or parts replacement, or downtime required as a result of . . . design or building, van, or trailer structural deficiency [or] power surge, fluctuation, or failure." Pl.'s Resp. Mot. Summ. J., Ex. 14 at 2 [Doc. #51-16].

On August 29, 2005, Hurricane Katrina struck, and the hospital lost power that morning. The MRI was not attached to a alternate power source, but the hospital did have operative, but limited, generators. It is undisputed that when GE's Field Service Engineer, Rick Miley inspected the MRI on August 31, two days after the loss of power, the magnet had quenched. Pl.'s Resp. Mot. Summ. J. at 4 [Doc. #51]. In October 2005, GE sent in its team of technicians to refill the helium vessel and restore superconductivity. These attempts were unsuccessful due to a molecular level leak in the seam or weld of the helium vessel. It is undisputed that the quench caused the vessel leak as the MRI was working properly before the storm, but it is contested *why* the quench cracked the vessel.

FIC bases its theory about why the vessel cracked on an initial report by GE's Field

Service Engineer Rick Miley, who consulted several other GE engineers during the course of his analysis, including GE's Senior Cryogenics Engineer Roy Mangano. Pl.'s Resp. Mot. Summ. J. at 4-5 [Doc. # 51]. The report suggests that water blew into the roof vent during the hurricane and pooled by a burst disc inside the vent. This burst disc is designed to rupture when a certain pressure is reached due to the escaping helium gas. Plaintiff alleges that as the incredibly cold helium gas reached the burst disc, the water on the other side of the burst disc was instantly frozen, forming an ice plug over the burst disc and prohibiting the rapid escape of helium gas. This ice block caused over-pressurization in the helium vessel in excess of its design limits which ultimately caused the vessel leak. GE argues that this theory fails to explain the effect of the 1/8" weep hole in the area of the burst disc that drains off any water that enters the vent. Def.'s Br. Supp. Mot. Summ. J. at 28 [Doc. #38]. While GE's head of mechanical engineering says that the ice block theory is possible, he maintains that further testing and analysis would be needed to prove this theory to some degree of scientific certainty. Def.'s Br. Supp. Mot. Summ. J. at 5 [Doc. # 38]. FIC counters that some vent plans show a drain plug or a brass fitting and not a weep hole. FIC also disputes the significance of a weep hole, claiming that the water in the vent system would have frozen so fast that a weep hole would have had little effect. Pl.'s Resp. Mot. Summ. J. at 8-9 [Doc. #51].

Regardless of which drain system was in place, FIC's main contention is that the quench vent system's design fell below the industry's standard of care because "wind driven rain could blow into the quench vent." Pl.'s Resp. Mot. Summ. J. at 12 [Doc. # 51]. FIC contends that GE was aware of the potential problems associated with rain entering the quench system. In support of its position, FIC points to a 2003 medical device alert about a non-GE MRI quench failure in

the United Kingdom. In this case, wind-blown rain entered the quench vent and froze, which blocked the magnet quench and released helium into the room. In sum, FIC contends that the quench vent was negligently designed and that GE knew or should have known of the consequences of that negligent design.

As a result of the cracked vessel, Forrest General decided to replace the entire MRI instead of just the magnet. It upgraded to a more powerful MRI and FIC, the hospital's insurer, paid the claim. FIC indemnified the hospital for the property damages and business losses totaling $1,320,609.40. Pl.'s Resp. Mot. Summ. J. at 4 [Doc. #51]. FIC then filed suit against GE as subrogee of the hospital. FIC brings various tort and contract claims including: (1) negligent design of the MRI quench system, (2) negligence in failure to warn of the known risk of a magnet quench if the vent is obstructed; (3) negligence in its failure to properly service and maintain the MRI by failing to take action when electric power was lost; (4) breach of the service and support agreement; and (5) breach of the implied warranties provided by Mississippi law. Pl.'s Resp. Mot. Summ. J. at 9 [Doc. # 51].

## II. STANDARD OF REVIEW

Summary judgment is appropriate when the evidence before the Court shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED R. CIV. P. 56(b). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.* There can be no genuine issue as to a material fact when a party fails "to make a showing sufficient to establish

the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). This is true "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting *Anderson*, 477 U.S. at 247). "[I]f the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

If the moving party fails to meet its "initial burden, the motion must be denied, regardless of the nonmovant's response." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. The nonmoving party must show more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), and cannot satisfy its burden with "conclusory allegations [or] unsubstantiated assertions." *Little*, 37 F.3d at 1075. "[T]he nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Id.*

In evaluating the evidence tendered by the parties, the court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson,* 477 U.S. at 255. While courts will "resolve factual controversies in favor of the nonmoving party," an actual controversy exists only "when both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075.

## III. APPLICATION AND ANALYSIS

"Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996); *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). In this case, jurisdiction is based on diversity and Mississippi law is controlling.

### Count I: Negligent Design of the Quench System

FIC claims that GE's design of the quench system was negligent. The elements that a plaintiff is required to prove in a negligence action are well established. "A plaintiff in a negligence suit must prove by a preponderance of the evidence (1) duty, (2) breach of duty, (3) causation, and (4) injury." *Patterson v. Liberty Assoc's, L.P.*, 910 So.2d 1014, 1019(¶ 14) (Miss. 2004) (citing *Miss. Dep't of Transp. v. Cargile*, 847 So.2d 258, 262(¶ 11) (Miss. 2003)). "Foreseeability is an essential element of both duty and causation." *Id.* (quoting *Delahoussaye v. Mary Mahoney's, Inc.*, 783 So.2d 666, 671(¶ 13) (Miss. 2001)). An engineer or architect's duties can arise under a contract. *See Lyndon Prop. Ins. Co. v. Duke Levy & Assoc.*, 475 F.3d 268, 273 (5th Cir. 2007) (finding that contractual language supported duty to inspect work). Also, "Mississippi law imposes on design professionals, including architects and engineers, the duty to

'exercise ordinary professional skill and diligence.'" *Hobson v. Waggoner Engineering, Inc.*, 878 So.2d 68, 77 (Miss. App. 2003).

FIC contends that GE provided design plans and specifications for the quench system that fell below industry standards and that the design was defective because "wind-driven rain could blow into the quench vent." FIC claims that GE knew or should have known of this risk and the potential damage to the MRI and potential injury to persons, and should have designed a weatherproof vent system. They also claim to have incurred "significant monetary damages" as a "direct and proximate result of the negligent acts and omissions" of GE.

GE's first argument for summary judgment is that it had no duty to the hospital because Caffey, not GE, was responsible for designing and constructing the improvements. Indeed, deciphering GE's duties in regards to the design of the quench system is a task made difficult by the numerous contractual relationships between GE Capital, GEMS, and Forrest General from the time the hospital first leased the MRI and renovated its facilities to the time the helium vessel failed.

First, GEMS developed the Installation Manual that included the cryogenic vent specifications. As Lessor, GE Capital required that the hospital comply with these specifications for building improvements necessary for the safe operation of the MRI. The Lease Agreement between GE Capital and the hospital clearly states that "Lessee shall be responsible for making the site ready for installation in compliance with Lessor's written specifications." [Doc. # 40-2 at 15]. Under the lease, then, GE Capital accepted no responsibility for the ultimate design of the cryogen vent system. However, the Installation Manual contained "physical, magnetic, cryogenic, plumbing and electrical data necessary for planning and preparing a site for a

magnetic resonance system."   Def.'s Br. Supp. Mot. Summ. J., Ex. I, Sub-Ex. 1 at 19 [Doc. #40-10] (hereinafter "Installation Manual").   GEMS provided several cryogenic venting requirements with respect to the vent size, construction, support, and exit and termination with which the hospital was required to comply.   Installation Manual at 42 [Doc. # 40-10].   For the roof top exit, GEMS recommended that "the exhaust flow be directed horizontally using a 90° elbow having minimal pressure drop and the outlet covered with a 0.5 inch (12.7 mm) mesh screen to prevent the entry of foreign material.   See Illustration 4-10.   Other low pressure drop, high flow rate roof caps are acceptable." *Id.*   The Manual also warns that the vent exit should end at least three feet above the roof deck (or more if snow drifts could block the exit at this height), and warns that the vent should be directed away from intake vents and areas where maintenance personnel or building components could be exposed to and injured by escaping exhaust gas.   *Id.*   GEMS's engineers have a duty to "exercise ordinary professional skill and diligence" when providing these specifications.

Subsequently, GEMS and the hospital contracted for the renovation of the building to accommodate the MRI machine.   Under the Renovation Contract, GEMS agreed to perform certain work, including "corrections and additions to existing heating, ventilating or air conditioning systems." [Doc. # 40-2 at 45].   GE claims that it provided specifications, but that ultimately Caffey was responsible for the design, installation, and construction.   GE contends that its Installation Manual suggests a roof cap at the end of the vent system that has a ninety degree elbow but otherwise states that "[o]ther low pressure drop, high flow rate roof caps are acceptable."   Def.'s Rebuttal at 6 [Doc. #56].   They argue that Caffey had discretion to chose a particular roof cap that would suit the purposes at the particular hospital and so Caffey would be

responsible for ensuring that a weatherproof cap was chosen. FIC counters that GE provided detailed designs for the quench system and further required that: "Any deviation from these drawings must be communicated in writing to and reviewed by your local GE Healthcare Service Representative prior to making changes." Pl.'s Resp. Mot. Summ. J. at 23 [Doc. # 51]. FIC has presented enough evidence to create a genuine issue of material fact for the fact-finder. For the purposes of this motion, the Court must view the facts in the light most favorable to the non-moving party and assume that GEMS played a significant role in the design of the quench system. Therefore, GE has not met its burden to demonstrate an absence of a genuine issue as to GEMS's duty to exercise ordinary professional skill and diligence in its development of the quench vent system's specifications and designs, and summary judgment is not appropriate on this ground.

Of course, looking at GEMS's duties separately leaves the Court with an awkward analysis: whether GEMS had a duty to give *itself* better specifications for the quench vent system that it allegedly ultimately designed and constructed under the terms of the Renovation Contract. If the hospital had contracted someone else to design/ build the vent system to GEMS's Installation Manual specifications, the Court clearly would be permitted to question whether GEMS's specifications were sound under an ordinary design professional's knowledge and skill. It seems counterintuitive that GEMS's agreement to be involved with construction would somehow relieve GE of its duty to exercise professional standard of care in providing pre-installation specifications. For this reason, the Court will separately consider the obligations of GEMS in each of its roles throughout its analysis.

GE challenges causation in its next two grounds for summary judgment. First, GE argues

that Hurricane Katrina was an "act of God" that bars tort liability. An "act of God' defense is defined as "any accident, due directly and exclusively to natural causes without human intervention, which by no amount of foresight, pains, or care, reasonably to have been expected could have been prevented." *McFarland v. Entergy Mississippi, Inc.*, 919 So.2d 894, 903 (Miss. 2005) (citations omitted). "'Act of God' does not apply if there has been an intervening circumstance attributed to the defendants." *Id.* The "act of God" defense does not apply if the defendant could have prevented the damage by exercising reasonable care. *Id.* Second, GE argues that if the court finds that if the sole cause was not an "act of God," the hospital's failure to provide power to the MRI machine after the storm was the superceding and sole proximate cause of the damages. When the plaintiff's own negligence is the sole cause of injury, the defendant is relieved from liability. "[W]hen reasonable minds might differ on the matter, the question of what is the proximate cause of an injury is usually a question for the jury, and likewise questions of negligence and contributory negligence are generally for the determination of a jury." *Am. Creosote Works of La. v. Harp*, 60 So.2d 514, 517 (Miss. 1952) (citations omitted).

There is a genuine issue of material fact as to the cause of the damage to the MRI's helium vessel. While the destruction of Hurricane Katrina was vast, the helium vessel did not leak as a direct result of the storm. Evidence presented could lead a reasonable fact-finder to conclude that the damage to the helium vessel may have been avoided by hooking the MRI to the back-up power supply, draining water from the quench vent through active measures or passive features, or designing the roof cap and vent to prevent water intake in the first place. Similarly, it is not clear from the evidence that the loss of power was the sole proximate cause. The system

is designed to quench in the case of loss of power, so loss of power alone cannot be considered the sole reason the vessel was damaged. In other words, if the system was properly functioning, the vessel may not have cracked. The court must view the evidence in the light most favorable to the non-moving party, and the evidence presented demonstrates a genuine issue of material fact regarding the causation of damages.

GE next asserts that the negligence claims are barred by exculpatory language in the contracts, or, if the claims are allowed, that the damages are contractually limited. "Under Mississippi law, '[c]lauses that limit liability are given strict scrutiny by this Court and are not to be enforced unless the limitation is fairly and honestly negotiated and understood by both parties.'" *Lyndon Prop. Ins. Co.*, 475 F.3d at 272 (quoting *Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc.*, 857 So.2d 748, 754 (Miss. 2003)). The intention of the parties to exculpate a party from its negligence must be expressed in "clear and unmistakable language." *Id.* Courts give less deference to the exculpatory clause if the interests of the public are implicated. *Id.* A court can also refuse to enforce unconscionable clauses. *Covenant Health & Rehabilitation of Picayune, L.P. v. Moulds*, 14 So.3d 695, 700 (Miss. 2009). "Substantive unconscionability is proven by oppressive contract terms such that 'there is a one-sided agreement whereby one party is deprived of all the benefits of the agreement or left without a remedy for another party's nonperformance or breach....'" *Id.* at 699-700 (quoting *Bank of Indiana, Nat'l Ass'n. v. Holyfield*, 476 F. Supp. 104, 110 (S.D. Miss. 1979)).

As previously noted, GEMS had a common law duty to exercise ordinary professional care in providing its Installation Manual specfications, while any duty in its role as designer or contractor, if any, would arise under the Renovation Contract. Assuming as above that GEMS

was responsible for the design, however, the Renovation Contract contains exculpatory language disclaiming any negligence or tort liability arising from the contract and limiting recoverable damages.  The Renovation Contract's exculpatory clause states:

> **12.  LIMITATIONS OF REMEDIES AND DAMAGES:** THE TOTAL LIABILITY OF COMPANY AND COMPANY'S REPRESENTATIVES TO OWNER AND OWNER'S EXCLUSIVE REMEDY RELATING TO THIS CONTRACT AND THE WORK IS LIMITED TO THE PRICE STATED IN THIS CONTRACT FOR THE WORK WHICH IS THE BASIS OF THE CLAIM.
>
> Owner agrees that Company and Company's representatives have no liability of Owner for (1) any punitive, incidental or consequential damages such as lost profit or revenue, (2) any assistance not required under this Contract, or (3) anything occurring after the date of acceptance of the Work.
>
> Owner will be barred from any remedy unless Owner gives Company prompt written notice of the problem complained of.
>
> This is a commercial construction transaction. Any claim related to this contract will be covered solely by commercial legal principles.  COMPANY, COMPANY'S REPRESENTATIVES AND OWNER WILL NOT HAVE ANY NEGLIGENCE OR OTHER TORT LIABILITY TO THE OTHER ARISING FROM THIS CONTRACT.  The limitation does not affect claims by third parties for personal injury due to Company, Company's representatives' or Owner's negligence.

[Doc. # 40-2 at 37].  The Renovation Contract was formed between two sophisticated, commercial parties of equal bargaining power.   The language appeared in bold, capitalized print in a three page document listing "General Conditions" of the Renovation Contract. The public interest is not implicated because the clause still allows suits by third parties for personal injury arising from GE's negligence.  Finally, the hospital had a right to seek damages up to the cost of the contract for any breach of GE's contractual duties.  Therefore this Court holds that the clause effectively bars FIC's claim against GE for any negligent design arising under the Renovation contract.

However, as noted above, the Renovation Contract did not cover all of GEMS's involvement with the design of the quench system.  GEMS was responsible for providing building specifications to the hospital through the Installation Manual.  No contractual duty existed between GEMS and the hospital for this service.  GEMS's engineers had a duty to exercise ordinary professional skill and diligence.   Since this duty was extra-contractual, the clause limiting liability and remedies in the Renovation Contract would not apply to GEMS in this capacity.  Therefore, the claim for negligent design is viable against GEMS despite the tort liability waivers because there is no contractual language waiving the duty to provide reasonable design specifications.  A genuine issue of material fact remains as to whether GEMS breached its duty to provide specifications that meet the standards of a professional engineer of ordinary skill and knowledge.

Next, GE contends FIC's tort claims are barred under the economic loss doctrine. The economic loss doctrine applies in product liability cases and bars tort claims when the only damage is solely economic or when the only damage was to the product itself.  *See State Farm Mutual Auto. Ins. Co. v. Ford Motor Company*, 736 So.2d 384, 387 (Miss. App. 1999); *Lee v. General Motors Corp.*, 950 F.Supp. 170, 174 (S.D. Miss. 1996).  However the economic loss doctrine has not been extended beyond product liability cases to apply to tort claims involving a duty shaped by a contract.  *See Lyndon Prop. Ins. Co. v. Duke Levy & Assoc.*, 475 F.3d 268, 274 (5th Cir. 2007) (declining to apply economic loss doctrine in tort action against engineer for negligent inspection and approval of  work done by sewer contractor); *Mississippi Phosphates Corp. v. Furnace and Tube Serv., Inc.*, No. 1:07cv1140 LG-RHW, 2008 WL 313770 at *1 (S.D. Miss. Feb. 1, 2008) (declining to apply economic loss doctrine in tort action against party

contracted to provide labor, material, and equipment to retube waste heat boiler). An improvement to real property is not a product. *Ferrell v. River City Roofing,* 912 So.2d 448, 457 (Miss. 2005). An improvement is a "valuable addition made to property (usually real estate) . . . intended to enhance its . . . utility or to adapt it for new or further purposes." *Id.* at 454 (quoting *Phipps v. Irby Constr. Co.*, 636 So.2d 353, 368 (Miss. 1993) (quoting BLACK'S LAW DICTIONARY 682 (5th ed.1979))).

The quench vent system that FIC contends is defectively designed is best characterized as a structural improvement and not a product. The vent which was constructed pursuant to a Renovation Contract was an addition to the hospital's building to adapt it for operation of a MRI. While it is true that GEMS was granted a waiver under the Renovation Contract, its common law duty to use reasonable professional standard of care in providing specifications is more similar in kind to a duty arising under a contract than a products liability action. Since the claim challenges the sufficiency of the design and specifications of the vent system, a structural improvement, and not alleging a design defect in the actual MRI, which would be characterized as a product, the economic loss doctrine would not apply.

Lastly, GE contends that FIC's experts, Tobias Gilk and Robert Junk, are not competent to provide expert testimony regarding the breakdown of the MRI system. FIC has presented the testimony of these architects for two purposes: to testify as to alternative weatherproof roof cap designs and to testify as to how the system failed during the quench, namely, the "ice plug theory." It is this second opinion that GE contends they are not qualified to proffer and is the focus of GE's Motion to Exclude Expert Testimony [Doc. #39] of Gilk and Junk. For the purposes of this motion, GE contends that without the expert testimony of Gilk and Junk, FIC

15

will not be able to establish a defect in the vent system and thus, summary judgment is appropriate.

The Court finds that this is not a sufficient basis for summary judgment without ruling on the merits of the Motion to Exclude Expert Testimony. FIC has presented other evidence from which a jury could conclude that the "ice block theory" is plausible. Specifically, GE's own technicians put forth this theory in its report following the magnet quench. Therefore, the outcome of the *Daubert* ruling on the expert testimony of Gilk and Junk is not determinative of the outcome of the trial.

Therefore, GE's motion for summary judgment is denied as to the claim that GE negligently failed to specify an appropriately weatherproof design for the quench system in its Installation Manual, but is granted as to the claim that GE negligently failed to design the quench system due to contractual waiver of liability.

### Count II: Negligent Failure to Warn About Risks Associated with Vent Obstruction

The parties do not cite any Mississippi case law involving negligent failure to warn of risks associated with structural improvements. In *George B. Gilmore Co. v. Garrett*, the Mississippi Supreme Court upheld a jury verdict finding that the builder had a duty to warn of potential problems associated with building a home on land consisting of sub-surface yazoo clay. 582 So.2d 387, 393 (Miss. 1991). "[A] contractor who knows, or should know of a defect in a particular subsoil does not perform his contractual obligations in a workmanlike manner if he fails to notify the owner of the existence of the condition." *Id.* The Court emphasized that the contractor knew or should have known the risks of placing a foundation on yazoo clay before 1977 when the construction took place. *Id.* Namely, the Court said that its 1977 decision about

severe structural problems due to yazoo clay and publications from as early as 1960 about yazoo clay in Madison County, the site of the construction at issue, gave the contractor knowledge of the existence of the problem. *Id.* The court also indicated that the contractor had superior knowledge of soil quality risks while the owners had none. *Id.* The Court stated that "[had] the homeowners been aware of the danger of yazoo clay, they would have known the importance of seeing that the surface water was drained away from the house and not permitted to stand and seep into the ground." *Id.* at 393 n.3.

The law in Mississippi relating to the duty to warn about dangers of which an engineer becomes aware *after* the construction of a structural improvement is not well developed. The Mississippi Products Liability Act, MISS. CODE ANN. § 11-1-63 ("MPLA"), does not apply to structural improvements. See *Ferrell v. River City Roofing*, 912 So.2d 448 (Miss. 2005); *Moore v. Jesco*, 531 So.2d 815, 817 (Miss. 1988) (action based on strict liability will not lie as matter of law in case alleging defective design of chicken house because component parts of chicken houses constitute "improvements to real property"); see also *Bragg v. U.S.*, 55 F.Supp.2d 575, 593 (S.D. Miss. 1999) (hangar doors were fixtures, not products, so § 11-1-63 would not apply). Although the MPLA does not apply, in the absence of law relating specifically to structural improvements, reference to the statute may be instructive as to how Mississippi courts would rule on such matters. Specifically, Mississippi courts have ruled that the Mississippi Products Liability Act does not create a post-sale duty to warn. See *Palmer v. Volkswagon of Am., Inc.*, 905 So 2d 564, 601 (Miss. Ct. App. 2003), *aff'd in part and rev'd in part, remanded*, 904 So.2d 1077 (Miss. 2005) (finding that § 11-1-63 imposes liability for warnings that were inadequate at time of sale, not inadequate at some later time); *see also Noah v. General Motors Corp*, 882

So.2d 235 (Miss. Ct. App. 2004), *cert. denied*, 882 So.2d 772 (Miss. 2004); *Austin v. Will-Burt Co.,* 361 F.3d 862, 870 (5th Cir. 2004).

In support of its failure to warn negligence claim, FIC alleges that GE was aware of an incident in Europe in 2003 (occurring after this installation) where water blew into quench vent during a rainstorm, blocked the quench, and allowed helium to escape into the room. FIC has not presented evidence of whether the vent system in the United Kingdom incident was comparable to the one at issue in this case. More specifically, there is no evidence that the United Kingdom quench vent had passive features that prevented the entry of material or blockage, such as a ninety degree angle of the roof vent, a mesh covering, or a weephole. Even if the U.K. quench vent was comparable to the one used at Forrest General Hospital, this Court declines to create a duty for a contractor to warn of risks discovered after the construction of the improvement. Therefore, this evidence alone is not sufficient to support a claim of negligent failure to warn.

Arguably, the only evidence that GE was aware of the risks associated with vent pipe obstruction at the time of the construction is testimony that the vent pipe had a drain plug that could be used to drain water out of the quench vent. Pl.'s Resp. Mot. Summ. J. at 13 [Doc. # 51]. FIC notes that the Installation Manual does not provide any guidance to the GE Field Engineers on the use of the drain plug. Of course, GE contends that it is not responsible under its service contract for quench vent maintenance, but, if the Manual was silent on the use of the drain plug, the hospital would have no guidance on drain plug's use either. The hospital, like the homeowner in *Garrett*, may have taken some preventative steps had it received guidance from GE. GE, as both the provider of specifications and possibly the designer of the quench vent,

certainly had knowledge superior to that of the hospital. Therefore, while FIC has presented scant evidence that GE was aware of the risks of a quench vent obstruction, it has presented enough evidence to preclude summary judgment on this claim.

As noted above, the Renovation Contract contains an exculpatory clause that states that neither party will have "any negligence or other tort liability to the other arising from this contract. The analysis follows that of the Court in Count I, *supra*. Specifically, the exculpation, while effective in relieving GE from liability in its role as designer and builder under the Renovation Contract, would not relieve GE of its common law duties arising from its role in providing specifications in the Installation Manual. Therefore summary judgment is denied as to the claim that GE negligently failed to warn FIC of the risks of vent obstruction. However, the claim should be limited to the duties of GE as specification provider.

### Counts III: Negligent Failure to Properly Service and Maintain MRI in Aftermath of Power Loss

FIC argues that GEMS was negligent in its service of the MRI after the storm. Specifically, they claim that the technician that arrived on the scene the day after the storm should have acted to prevent the quench by ramping down the magnet or by hooking the MRI to the back up power supply. However, GE has presented evidence that ramping down the magnet was not a viable option because this process required equipment and technicians that were not readily available due to the storm. GE also argues that the technician that was able to arrive at the hospital the day after the storm was not the MRI technician, but was responsible for other equipment. Further, the MRI room had been locked down, so the first technician on the scene did not have access. The actual technician who was responsible for the MRI was only able to

arrive at the hospital two days after the storm, after the magnet had already quenched.   GE's

duty to get qualified technicians to the hospital in the aftermath of the storm to take preventative

measures relating to the MRI would arise under the service contract.   However, the contract

clearly states that  "Lessor shall not be liable for delays or failures in performance of any

obligation under a Schedule or the Agreement due to a cause beyond its reasonable control."

[Doc. # 40-2 at 13].   The Court finds that GE's failure to get a MRI-qualified technician to the

hospital in time to service the equipment was beyond its reasonable control due to the occurrence

of the catastrophic hurricane.

Finally, in the aftermath of the storm, when power and resources at the hospital were

necessarily allocated between many needs, it was ultimately the hospital's decision how to

allocate power during this crisis.   Ultimately, it was the hospital's contractual duty to supply

power.   All of the contracts between the hospital and GEMS required the hospital to provide

constant power to the MRI equipment.   Therefore maintenance could not be negligent for failing

to provide power when they had no duty to do so.   GE's motion for summary judgment on

negligent service is therefore granted.

### Count IV: Breach of Service and Support Agreement

FIC alleges that GE breached its service contract in several ways.   Specifically, FIC

alleges that  GEMS breached its Uptime Service Commitment, did not provide a service

technician on site post-storm within two hours as promised, and did not repair or replace the

damaged magnet.   In response, GE argues that this contract claim is barred by act of God

defense and the contracts themselves.

As discussed earlier, an "act of God' defense is defined as "any accident, due directly and

20

exclusively to natural causes without human intervention, which by no amount of foresight, pains, or care, reasonably to have been expected could have been prevented." *McFarland v. Entergy Mississippi, Inc.*, 919 So.2d 894, 903 (Miss. 2005) (citations omitted). Acts of God waive contract liability when specifically contemplated by the parties. *See U.S. Fidelity & Guar. Co. v. Rob Homes, Inc.*, 323 So.2d 105, 106-07 (Miss. 1975). Generally, nonperformance of a contract is not excused by an act of God, but "if a party desires relief from performance of his contract, because of an act of God, he must contract specially for that contingency." *Bunting v. Orendorf*, 120 So. 182, 183 (Miss. 1929).

The Uptime Commitment guaranteed that the equipment would be up and running 97% of the time, and it also included a two hour technician response time. The Uptime Commitment excludes equipment unavailability due to the hospital's failure to provide power or acts of God. [Doc. #51-16 at 7]. The Maxiservice schedule also states:

> EXCUSABLE DELAYS AND PERFORMANCE. Lessor shall not be liable for delays or failures in performance of any obligation under a Schedule or the Agreement due to a cause beyond its reasonable control.

[Doc. #40-2 at 13]. The hospital's QuantaCare service package with GEMS included "Magnet Maintenance Coverage with Cryogens" See Support Exhibit, Ex. 14 [Docs. #51-16; 40-2]. The document lists as one of GE's responsibilities: "adjust, repair, or replace, at GE's option, Covered Components and refill the cryostat with cryogens as necessary (unless you exclude the Cryogen Support)." [Doc. #51-16 at 4]. However, the Support Exhibit lists several exclusions:

> This Support Exhibit does not cover the following:
>
> . . .
>
> (f) Any service, components or parts replacement, or downtime required as the result of ... (ii) your failure to fulfill any of your obligations or responsibilities

under the Master Lease Agreement; ... (vi) design or manufacturing defects, specifications, or functionalities in any item of others; and (vii) anything external to the Equipment, including building, van or trailer structural deficiency, power surge, fluctuation or failure, dust, sand or other particles or debris at the Site, or air conditioning failure.

Finally, the Service Exhibit outlines the hospital's duties in a section entitled "Your Responsibilities." These responsibilities include providing "a suitable location for the Equipment and maintain the Site and environment (including temperature and humidity control, *incoming Power quality*, and fire protection system) in a condition suitable for operation of and service to the Equipment . . . ." [Doc. #51-16 at 2] (emphasis added).

Although the GEMS service contract guaranteed a two hour response time, these obligations were impossible due to an act of God. The technician was unable to get to the hospital sooner due to down trees, and could not call into the hospital because of lack of phone service. No amount of planning could avoid the chaos that resulted from Katrina. Further, imposing liability for a technician's failure to arrive within two hours would be against public policy. Following the devastation of a storm of Katrina's magnitude, it is in the public's interest to keep the roads clear of all non-emergency traffic. The parties specifically contracted for this contingency by including a clause addressing excusable delays.

As to the downtime, the Uptime Commitment contract specifically excluded downtime as a result of a structural deficiency which would include any negligent design of the quench vent system. The Uptime Commitment also excluded downtime as a result of the Lessee's failure to fulfill its obligations under the Master Lease which would include providing power to the MRI.

Finally, magnet replacement under the service agreement is also excused when the parts replacement is necessary due to the Lessee's failure to perform its obligations under the Master

Lease.  Again, as stated above, providing power was one of the hospital's obligations.  Further, GE would not be responsible for magnet replacement under the contract if the replacement was necessary because of  a structural deficiency external to the MRI.

In its complaint, FIC alleges that GE breached its agreement by "failing to take appropriate remedial action to guard against a known risk, specifically, the risk of destruction of the equipment itself, as a result of failure of the cryogen quench vent system."  Compl. ¶ 87(a). It is unclear from the complaint or the briefs if FIC is contending that GE had a contractual duty to maintain or service the quench vent itself.  GE argues that the service contracts did not cover maintenance of the quench vent in response to FIC's assertion that "GE's engineers were supposed to inspect the cryogen vent system."  Def.'s Rebuttal at 3 [Doc. # 56]; Pl.'s Resp. Mot. Summ. J. at 13  [Doc. # 51].

Turning to the service contracts, FIC has not presented any evidence that the quench vent was included in the regular maintenance provided under the contract.   FIC argues that the maintenance agreement was comprehensive and all-inclusive but they do not specifically demonstrate that the vent system was a covered component. Pl.'s Resp. Mot. Summ. J. at 29-31 [Doc. #51].   The characterization of the maintenance plan as the "'Cadillac' service plan" or statements that the maintenance plan means "if it breaks, we fix it" do not suffice as sufficient evidence that maintenance of the quench vent was included.  Pl.'s Resp. Mot. Summ. J. at 30 [Doc. #51].  FIC also cites Miley's Deposition in support of the assertion that the technicians should have inspected the cryogen vent.  Pl.'s Resp. Mot. Summ. J. at 13; [Doc. # 51]; Pl.s Resp. Mot. Summ. J., Ex. 2 at 168 [Doc. # 51-3].   The excerpt of the deposition in no way supports the allegation that GE was responsible for maintenance of the quench vent. In fact, FIC cites an

excerpt of Beier's deposition in the next sentence of its brief, and Beier's deposition supports the contention that GE's technicians are not instructed to inspect the quench vent system. Pl.'s Resp. Mot. Summ. J., Ex. 11 at 79-81 [Doc. #51-13].

In sum, the Court finds no evidence of a contractual duty to inspect or service the quench vent. Further the Court finds that the claim that GE breached its service contract by not providing service to the MRI after the storm should be dismissed because of excusable delay due to the effects of Hurricane Katrina and the limited resources resulting from the storm. The motion to dismiss FIC's breach of service contract claim is granted.

### Count V: Breach of Implied Warranties under Mississippi Law (Merchantability and Fitness for a Particular Purpose)

FIC's claim that GE breached its implied warranties of merchantability and fitness for a particular purpose must fail. "Except as otherwise provided in Sections 75-2-314, 75-2-315, 75-2-315.1, and 75-2-719, there shall be no limitations of remedies or disclaimer of liability as to any implied warranty of merchantability or fitness for a particular purpose." See MISS. CODE ANN. § 11-7-18. This statute does not create warranties, but only prevents parties from waiving warranties that already exist. *J.L. Teel Co., Inc. v. Houston United Sales, Inc.*, 491 So.2d 851, 859 (Miss. 1986). Therefore the Court must determine if the implied warranties of merchantability and fitness for a particular purpose exist for structural improvements before determining if the contractual waiver of these warranties was or was not effective.

Throughout its briefs, FIC argues that the design of the quench system was a service and not a product or good. Mississippi law is clear that the warranties of merchantability and fitness for a particular purpose apply to the seller of goods. See MISS. CODE ANN. § 75-2-314 (1) ( "... a warranty that the *goods* shall be merchantable is implied in a contract for their sale if the seller is

a merchant with respect to *goods* of that kind.")(emphasis added); § 75-2-315 ("...where the seller at the time of contracting has reason to know any particular purpose for which the *goods* are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable *goods,* there is an implied warranty that the *goods* shall be fit for such purpose.")(emphasis added). Mississippi law defines "goods" as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale..." Miss Code. Ann. § 75-2-105. In its annotations of judicial decisions, the Mississippi Code Annotated cites several cases that persuade this Court that the implied warranties of merchantability and fitness for a particular purpose would not apply to the design of a structural improvement or a contract for the performance of services. *See, e.g., Air Heater, Inc., v. Johnson Elec., Inc.*, 258 N.W.2d 649, 652 (N.D. 1977) (holding that UCC implied warranties do not apply to design and installation of electrical system in building); *Dep't of Transp. v. Bethlehem Steel Corp.*, 368 A.2d 888, 897 (Pa. 1977) (holding that allegedly defective bridge designs were not "goods" as defined by the UCC so that implied warranties of merchantability and fitness for a particular purpose were inapplicable to design plans); *Lee v. C & P Serv. Corp.*, 363 So. 2d 586, 588 (Fla. App. 1978), *cert denied*, 372 So.2d 469 (Fla. 1979) (UCC implied warranties did not apply in case against truck maintenance company who serviced brakes of truck that malfunctioned). The distinction between actions based on warranty, negligence, and contract was perhaps most succinctly put by the New York Court Of Appeals which stated that:

> Warranties are limited to sales of goods. No warranty attaches to the performance of a service. If the service is performed negligently, the cause of action accruing is for that negligence. Likewise, if it constitutes a breach of contract, the action is for that breach. The distinction in the case of a sale of goods is that a warranty gives rise to a cause of action without fault (Uniform Commercial Code, §§2-313, 2-314). No such right has ever been extended to include the consequence of a

25

performance of a service.

*Aegis Productions., Inc. v. Arriflex Corp. of Am.*, 268 N.Y.S.2d 185, 185 (N.Y. 1966).

GEMS's design of the quench system is most accurately characterized as a service and not a good that would be subject to the implied warranties of the UCC. The vent system certainly was not moveable at the time of sale. The greater part of FIC's complaint is alleging that the actual vent system design was defective. Although the design plans were "movable" the Court is persuaded by the holding in *Bethlehem Steel* that design plans are not UCC "goods" covered by the warranties of merchantability and fitness for a particular purpose.

Nor is the Court persuaded that the constructed quench vent system is a good covered by the UCC's implied warranties. Mississippi law does imply "in every building contract that the work of the builder be performed in a good workmanlike manner, free from defect either in material or workmanship." *Southland Enters., Inc. v. Newton Co.*, 838 So.2d 286, 293 (Miss. 2003). The courts have also recognized an implied warranty of habitability in residential construction. *See George B. Gilmore Co., v. Garrett*, 582 So.2d 387, 391 (Miss. 1991) ("The builder [] owes a duty to construct the home in a workmanlike manner and to construct a home suitable for habitation"). Here, FIC is alleging breach of merchantability and fitness for a particular purpose, and not alleging breach of these other warranties. The Court is not persuaded that these UCC warranties cover the quench vent, a structural improvement.

The MRI itself would be considered a "good" under the definition provided by the UCC. Miss. Code. Ann. §§ 75-2A-212 and 75-2A-213 establish implied warranties of merchantability and fitness for a particular purpose for leased goods if the lessor is a merchant of that kind of good and the lessee relied on the lessor's judgment and skill in selecting the good. In its

complaint, FIC argues that the MRI equipment itself was defective because it "could not safely shut down without risking destruction of the magnet and injury to hospital patients and staff in the [event] of a known risk, the loss of electrical power." Compl. at ¶ 91(b) [Doc. #1]. However, this claim must be brought against the Lessor, or GE Capital, and it has not been named a party to this suit. Therefore, FIC's claims for breach of implied warranties under the UCC should be dismissed.

## IV. CONCLUSION

In conclusion, GE's motion for summary judgment as to negligent design of the quench system is denied for the claim that GE violated its standard of care in providing specifications for the quench vent system, but is granted as to GE's possible role in designing and constructing the system. Likewise, GE's motion for summary judgment as to the negligent failure to warn is denied as to the claim relating to GE's duties when providing specifications in its Installation Manual, but is granted as to GE's duties as designer and/or builder. GE's motion for summary judgment as to the negligent service of the MRI and breach of service contract are granted. Finally, GE's motion for summary judgment as to FIC's claim that GE breached implied warranties of merchantability and fitness for a particular purpose are also granted.

IT IS, THEREFORE, ORDERED AND ADJUDGED that GE's motion for summary judgment [Doc. #37] is **denied** in part and **granted** in part.

SO ORDERED AND ADJUDGED on this, the 3rd day of December, 2009.

*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE